Hill versus Quigley Good morning, Your Honor. Your Honors, this case involves a police officer's use of deadly force in a case that went to trial two times and presented diametrically opposing versions of the events that gave rise to that use of force. The stakes for getting the jury instructions correct in this case could not have been higher. Yet, as the district court itself acknowledged, it did not get the jury instructions correct. Now, it acknowledged that fact with respect to the probable cause standard, the standard that must be met for a police officer to be justified in using deadly force. However, I'd like to begin with the other error that the district court committed, which was the level of intent required for an excessive force claim under Dancy v. McGinley. And I again reiterate, as we pointed out to the district court, that Dancy v. McGinley, although not a deadly force case, analogized two deadly force cases, Stamps v. Framingham from the First Circuit and Watson v. Bryant from the Fifth Circuit. Stamps itself cites cases from the fourth, sixth and ninth circuits, all dealing with unintentional discharges of a weapon, which is exactly the theory that the district court made it clear to the district court that we sought to argue here, and the district court would not allow it. I couldn't really figure out exactly what in this instruction prevented you from arguing that, or are you saying there's something else that prevented you from arguing that? Because it seemed to me under this instruction, you could argue that this was an improper discharge of a, I think you could have argued that he shouldn't have put the gun to his head and, you know, if it accidentally discharged, he was reckless in putting it to his head. I didn't see anything in the actual instruction that prevented you from arguing that. Well, Judge Rustani, I agree with you to the extent that we could have argued that one of the acts was reckless because reckless or intentional was the way that the district court instructed. However, what the district court also did was said, was to distinguish explicitly mistake, accident or negligence. In the Dancy case, the district court gave an instruction that distinguished mistake, accident or negligence and said the acts needed to be intentional or reckless. And that's exactly what the Dancy court says was incorrect. That's precisely the instruction that the district court gave here. So I'm having the same difficulty as my colleague and maybe you could help me with it because it seems like I'm that the instruction on force that was given is not inconsistent with your theory, but you didn't are. And I couldn't find in the record that you were prohibited from arguing the theory and summation, but you, but you didn't. Well, first of all, your honor, at the charge conference and which is in the record, we did make clear that this was the theory that we wanted to argue to the jury. But you wanted that theory to be expressed and we wanted to be an example in the instruction and that would have been very helpful for you. But I'm not seeing the language in the instruction that was inconsistent that, you know, that made it something that you couldn't pursue on summation, even if it was, wasn't explicitly referenced in the instruction. Two things, your honor. First, again, by distinguishing mistake accidents or accident or negligence, an unintentional discharge of a firearm when the court is saying it can't be based on mistake or accident, I don't think we could have argued that this was a mistaken discharge of the firearm. I think the court's instruction explicitly precluded it. They also the instruction refers to the acts and we focus on this in our briefing. It doesn't say some of the acts, even after the court denied our initial request, we said, please remove the word the, because by saying the acts need to be intentional or reckless, it's telling the jury all of the acts need to be when in fact the pulling of the trigger did not need to be. And the court again declined to modify the instruction in that way. So the jury was left with the belief that every act that was committed by Quigley, meaning the drawing of the gun, the pressing it against Hill's head, and the pulling of the trigger had to be intentional or reckless, but under Dan C.V. McGinley, it does not. Can I ask just another question that I was having difficulty with reading your briefs? I mean, the evidence, the police officer said, I intentionally pulled the trigger. Yes. And, and that's what that, that was the, how this case was tried from their, uh, from their perspective. So what is the evidence that it was that would have supported an instruction that, no, this was a mistaken, negligent, uh, pulling of the trigger. First and foremost, that Mr. Hill was unarmed at the time that he was shot. Obviously, if Mr. Hill was unarmed at the time he was shot, that directly contradicts Officer Quigley's stated justification for why he intentionally shot Mr. Hill. But if he, but he says he did it intentionally, that's the problem. Right. But we did not, we did not seek to argue our case based on what the defendant testified the facts were. We wanted to argue that the defendant was lying about the facts, that in fact he had no gun as multiple witnesses testified that the Mr. Hill was unarmed. He was unarmed. And so Quigley's whole justification was a falsehood. In addition, Quigley, contrary to his own trial testimony, approached the scene with his gun already drawn. Remember, Quigley testified that he saw the gun during a struggle, stepped back, removed his firearm, and shot. We have an eyewitness who's right next to the scene who says, no, he had his gun out when he got to the scene. We know that his gun was pressed into the back of Mr. Hill's head. The muzzle was in contact with Mr. Hill's head at the time he pulled the trigger. Again, which is inconsistent with Quigley's own testimony, who says there was distance between them, and says that he stood up in order to fire the gun. So those facts, in addition to the other inconsistencies and the other eyewitness statements that suggest that there was a cover-up of what truly transpired here, are the facts that we rely on. For that theory. The witnesses who testified there was no gun, we had the girls who were intoxicated, right? They were some of the witnesses. We had a cab driver, who I'm not sure what his ability to see was. And we had the fellow with the 911 call, which didn't come in. Darius Smith. That's the witnesses for about the no gun, right? And certainly Darius Smith was the key witness. He was a preacher, a former Newark police officer for 13 years. He was parked in an SUV directly to the right of the scene where this transpired. He testified that he had a clear view and he was unequivocal that Mr. Hill did not have a gun at the time he was shot. You've reserved three minutes for rebuttal, Mr. Shanice. Ms. Good morning and may it please the court. I'm Melanie West for the defendant, Sergeant Patrick Quigley. The appellant raised three issues on this post-trial appeal. None of them warrant a third trial in this case. I'll start with the intent issue because that's what my adversary has raised. As your honors have noted, nothing in the jury instructions foreclosed the plaintiff from raising the theory that they now say they wanted to raise with the jury. The court specifically instructed the jury that they did not need to find that Sergeant Quigley intended to deprive Mr. Hill of his constitutional rights, only that the acts that led to the deprivation had to be either intentional or reckless. The theory they now say they wanted to advance the jury falls well within the ambit of recklessness that he ran up to the scene with his gun drawn, intentionally pointed it at Mr. Hill, and then accidentally pulled the trigger. But that theory was not supported by the evidence. None of the facts that have been identified by my adversary support an accidental shooting theory. The fact that somebody testified that he drew his gun earlier than Sergeant Quigley said he drew his gun does not support a theory of accident. But in any event, nothing in the jury instruction foreclosed them from presenting this theory to the jury. They chose not to do so, and they can't. The other instruction, which- Let me turn to that. The trial judge said it's not the instruction that's required to be given. Yes, so the question on that one is whether or not it was in plain error. It's true that the district court did not use the more restrictive formulation that this court endorsed in Razanen and Callahan. But what this court said in Callahan is it is plain error unless it conveys to the jury that the only circumstance in which deadly force is acceptable is when an officer has probable cause to believe that there's a significant risk of bodily harm or death. And this instruction, taken as a whole, conveyed that to the jury. Unlike in both Callahan and Razanen, there was no confusion here because the judge did not also instruct them about objectively unreasonable. That language was in both- In Razanen, there was no reference to the deadly force standard. Razanen just said they just presented the general excessive force standard. The instruction about immunity and a few other things that could have been confusing to the jury if you didn't use the proper instruction. So let me take these things in turn. So first of all, the court instructed the jury that the question was whether or not Sergeant Quigley had probable cause to believe that there was a significant risk of death or bodily harm. That is consistent with what this court has said, that a jury must understand that that's the question. I think the immunity point is a red herring, Your Honor. It was not used in the context of qualified immunity in any way. The jury was never instructed about qualified immunity. The term was used colloquially in summarizing the defendant's position. He said the question for you is whether or not Sergeant Quigley acted in self-defense because he had probable cause to believe that there was a significant risk of bodily harm or death, in which case he would be acting within his immunity as a police officer. So in that context, the term immunity just means immune from liability. It wasn't nothing in the instructions, nothing in the summary leading up to the instructions, confused the jury in any way by presenting them with any concept of qualified immunity. It was a colloquial use of the term and taken in context. And when you read the instruction as the whole, there's no confusion about the question they were being asked to decide. Unless the court has any further questions. Yes. The 911 call. Yes. And the exclusion of the 911, because that seemed to me an error. And tell me why it's not. Well, so the standard. It's not, in this case, a very significant error because the real witness here, the key witness, was that fellow who made that call. And it seems to me there's a lot of difference between saying something now and having proof that he said it at the time. I don't understand how that is, quote, prejudicial under 403 and can be excluded on that basis. So the standard of review is manifest error or abuse of discretion. And it satisfies the hearsay. It's not hearsay, inadmissible hearsay. It's admissible hearsay. The judge keeps it out because it's prejudicial. Right? I'm not sure that that's true, that it falls within a hearsay exception. But let's set that aside for a moment. Present sense of expression or excited utterance. Actually, I listened to the tape. It sounded like an excited utterance to me. Well, it's after the fact, Your Honor. It's making statements, opinion statements about what occurred. It's saying he was resisting arrest. It's not, I mean, the court of appeals, the New York State Court of Appeals has held that a 911 call made after the fact, that sort of, you know, is not, does not fall within excited utterance. But even setting that aside. That wasn't the basis for excluding it. Exactly. That was not the basis for excluding it. Returning to my colleague's question, why was it prejudicial so it should have been excluded? Well, so the court held that it was cumulative because Mr. Smith was able to testify as to what he saw and what he said on the 911 call. And nobody questioned that he said what he said he said on the 911 call. I was able to testify that I made a 911 call and this is what I said on the 911 call? Yes. I said I saw the fellow, he was unarmed, he got, that's what I said? Yes. And remember, this is now the second trial. This judge has presided over two trials where he has heard this witness testify and listened to the calls. And Mr. Smith testified precisely as to what he said on the 911 call. And that was not called into question by the defendants. They never contradicted that he said what he said he said on the 911 call, if you can make any sense of what I just said. But the only... I have to have that part of the transcript because I thought he testified as to what he saw, not what he said on the 911 call. He also testified as to what he said when he called 911. Do you happen to know where that is? I don't offhand, Your Honor. I'm sorry. I apologize. All right. And so because of that, the court held it was cumulative. And it was, you know, arguably prejudicial because he was, Mr. Smith was making all kinds of, you know, opinion statements about what had occurred. And so to find that it was a manifest error to exclude a 911 call where the witness was able to appear and testify as to everything he said on the call is simply not warranted on this record. Unless the court has further questions, we will rest on our wreaths. Thank you, Ms. West. Can you straighten me out on the transcript? Did he actually get to say I made a 911 call and this is what I said during the 911 call? He was able to say I made a 911 call and that was all. No, he was not permitted to testify as to what he said on the 911 call. Judge Hellerstein's ruling made it clear that he could not and that we could not get into the content of that unless it was to be used as non-hearsay to rehabilitate an allegation of a fabrication. Then everybody started tiptoeing around so that the call wouldn't come in. Correct. Well, I mean, this was an important issue that we raised with Judge Hellerstein because, indeed, the case had been tried twice. And we knew what the defense was arguing about Mr. Smith. And I want to address counsel's statement that we didn't dispute that Mr. Smith said what he said. Here's what counsel said in its summation. Mr. Smith, this is defense counsel, absolutely no gun, no gun whatsoever. The honest answer is I didn't see one. Big difference. The honest answer is I didn't see it. Of course he didn't see it from his vantage point. Of course. The dishonest answer is absolutely no gun. How did he get there? How did he get to that? You couldn't see it, but the physical references were pointing to plaintiff's counsel's table at the time, an insinuation that was made in the first trial as well, which is why we argued it was crucial that we be able to use this 911 call. Now, I do want to turn quickly to the qualified immunity question, because counsel suggests that the Court was not actually instructing the jury on qualified immunity. It was really only instructing the jury on saying that immunity from liability basically just means no liability. Well, that's not the case. The district court itself said, when we raised this issue, quote, I've heard that there's a mixed question and that these instructions are necessary to talk about how to deal with and what his state of mind has to be. And part of that state of mind is to understand, as a police officer, what the scope of his immunity is. He has to know what he can do. And that's the purpose of this clause, and I think I should keep it. So clearly, the district court thought that he was giving them an instruction related to absolute immunity. Those are statements made outside the presence of the jury. But my point, Your Honor, is that if the district court thought that he was saying something related to absolute immunity, how was the jury to know what he was talking about? Again, I want to get back to Rassanen and Doe with the little time I have left, because counsel stated the standard perfectly when she opened. She said, they have to be told the only time, the only time that deadly force could be used is when the probable cause standard is met. That's the essence of Callahan, that's the essence of Rassanen, and that's exactly the instruction that the district court failed to give here. Can I ask one other question? Going back to the Dancy argument for just a moment. So the use of force here, the theory was that the use of force was the intentional or reckless placing of the gun next to his head by your theory of the case, and that thereafter resulted in an accident, or that's one way you could look at the evidence. And I know other circuits have had cases that talk about brandishing a weapon or pointing it as being a use of force. But am I correct in saying that we haven't really addressed that issue in our case law? I don't know that it's been made clear by this circuit. I would take the position, or plaintiff would take the position, that both of those things would be the use of force, the drawing and brandishing of the weapon. But I don't think you have to get that far, because certainly the pressing of a weapon, pressing the muzzle of a gun into the back of someone's head, is both a seizure and a use of force. Okay. Thank you. Thank you. Thank you both. Reserve decision in this case.